**FILED**

**NOVEMBER 6, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINIOS
EASTERN DIVISION**

**07 C 6272**

| | | |
|---|---|---|
| CAREMARKPCS HEALTH, L.P., | ) | |
| a Delaware Limited Partnership, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| vs. | ) | |
| | ) | |
| WALGREEN CO., | ) | |
| an Illinois Corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**JUDGE FILIP
MAGISTRATE JUDGE KEYS**

**CEM**

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY
MOTION FOR TEMPORARY RESTRAINING ORDER**</u>

Howard M. Pearl
Peter J. Kocoras
Courtney M. Oliva
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600 (telephone)
(312-558-5700 (facsimile)

# I.     INTRODUCTION

Plaintiff, CaremarkPCS Health, L.P. ("Caremark"), moves for a temporary restraining order preventing Walgreen Co. ("Walgreens") from violating certain termination provisions in a Provider Agreement between Caremark and Walgreens.   Under the Provider Agreement, Walgreens dispenses pharmaceuticals to individuals who are eligible for the drug benefit administered by Caremark on behalf of health benefit plans that serve millions of plan participants.  Walgreens has notified Caremark that it intends to terminate its obligations under the Provider Agreement with respect to four of these plans within ten days.   The Provider Agreement, as amended, requires a thirty-day notice of termination.  The purpose of the thirty-day notice requirement is to allow time for an orderly transition to another retail network provider.   Essential to this orderly transition is that adequate notice of the change in retail providers be given to individual plan participants.  Advance notice allows plan participants time to transfer their prescription records to another retail pharmacy of their choice.  Thirty days is the amount of time that best ensures that plan participants are notified of the change in time to switch pharmacies, rather than discover it for the first time when their participant card is rejected at the pharmacy counter at Walgreens.

Unless enjoined by the Court, Walgreens' abrupt termination of the Provider Agreement will greatly disrupt Caremark's prescription drug service to tens of thousands of plan participants and will result in irreparable harm to the tens of thousands of these plan participants who rely on Walgreens to fill their prescriptions on a timely basis.  Walgreens' sudden termination of service of these plans leaves these participants with no choice but to wait for their medication while their prescriptions are transferred to a new provider or to pay for the entire cost of the prescription out of their own pockets, at a much higher price than that negotiated for the plans by Caremark.  This

delay or financial hardship may expose plan participants to potentially serious health risks while they wait for this transition to occur. Caremark therefore requests that this Court issue a temporary restraining order to prevent this harm to Caremark and its customers pending resolution of its claim against Walgreens.

## II.    STATEMENT OF FACTS[1]

### A.    Caremark's Business

Caremark provides comprehensive drug benefit services to over 2,000 health plan sponsors and their plan participants throughout the United States, including the health plans at issue in this action. (Compl. ¶ 12-13). Caremark provides the administration of pharmacy benefit management services under these health plans. (Compl. ¶¶ 12-13). Caremark's pharmacy benefit management services are designed to administer prescription benefit plans by providing access to prescription drugs and cost savings for plan participants and Caremark's health plan clients. (Compl. ¶ 12). Caremark places a premium on ease of access for its plan participants to retail pharmacies, offering plan participants the choice of obtaining their medications at one or more of over 62,000 participating local retail pharmacies, including Walgreens. (Compl. ¶ 14). Caremark accomplishes this by establishing national networks of retail pharmacies that dispense prescription drugs to participants of its client health plans. (Compl. ¶¶ 13-14). Caremark establishes these networks by entering into Provider Agreements with retail pharmacies, including Walgreens, for the dispensing of these prescription drugs. (Compl. ¶ 14).

### B.    The PCS Health Systems, Inc. Provider Agreement

On January 3, 2001, PCS Health Systems, Inc., the predecessor to CaremarkPCS Health, L.P., and Walgreens entered into a Provider Agreement. (Compl. ¶ 15, Exh. 1). The Provider

---

[1]  As all relevant facts are set forth in more detail in the Verified Complaint, this Statement of Facts is abbreviated.

2

Agreement sets forth the terms pursuant to which Walgreens dispenses prescriptions to participants in Caremark's client plans that participate in various national networks of retail pharmacies established by Caremark.

Section 8.1 of the Provider Agreement states that "[u]nless earlier terminated in accordance with the provisions of this Agreement, the Agreement will begin on the Effective Date and will remain in effect for an initial term of one (1) year and will automatically renew for successive terms of one (1) year each." (Compl. ¶ 16, Exh. 1). No such notice has ever been given by either party to the Agreement and, thus, the Agreement has remained and continues to remain in effect.

Section 1.3 of the Provider Agreement states that "[f]rom time to time PCS may amend this Agreement, the Schedules to which this Agreement refers, the PCS Manual or On-Line Info by giving notice to Provider [Walgreens] of the terms of the amendment and specifying the date the amendment becomes effective, which shall not be less than thirty (30) days after the notice." (Compl. ¶ 17, Exh. 1). Section 1.3 of the Agreement further provides that if Walgreens does not object within the thirty-day period, the amendment shall be effective as of the specified date. (Compl. ¶ 17, Exh. 1).

Pursuant to section 4.1 of the Provider Agreement, Walgreens was required to participate in various national networks established by PCS Health Systems, Inc. (Compl. ¶ 18, Exh. 1). Prior to being amended, under section 4.2 of the Provider Agreement, Walgreens could terminate its participation in any network or plan participating in one of PCS Health Systems, Inc.'s national networks by giving ten days' prior written notice specifying the date of termination and the names of the networks or plans in which Walgreens would no longer participate. (Compl. ¶ 19, Exh. 1). This provision has been amended. (Compl. ¶ 19).

C.    **The 2004 Acquisition of AdvancePCS by Caremark Rx, Inc.**

On March 24, 2004, Caremark Rx, Inc. acquired AdvancePCS, the parent corporation of PCS Health Systems, Inc.  (Compl. ¶ 20).  Prior to this acquisition, Walgreens and affiliates of Caremark Rx, Inc. had entered into a separate provider agreement, pursuant to which Walgreens dispensed prescriptions to participants in Caremark Rx, Inc.'s client plans participating in national networks.  (Compl. ¶ 21).

In April 2004, Caremark Rx, Inc. notified all retail pharmacies participating in its networks, including Walgreens, that in order to facilitate the integration of Caremark, Rx, Inc. and AdvancePCS, "both companies will be using the same base provider agreement effective August 1, 2004."  (Compl. ¶22, Exh. 2).  The notice further stated that the new agreement would consist of the Advance PCS Provider Agreement – which for Walgreens was the Provider Agreement with PCS Health Systems, Inc. that is described above – along with an exhibit and certain fee schedules not relevant here.  (Compl. ¶ 22, Exh. 2).  Accordingly, pursuant to this notice, the PCS Health Systems, Inc. Provider Agreement and the attachments referenced in the notice govern the terms of Walgreens' participation in all retail pharmacy networks established by Caremark Rx, Inc. and AdvancePCS and their affiliates.  (Compl. ¶ 22).

D.    **The 2007 Caremark Provider Manual**

Pursuant to Section 1.3 of the PCS Health Systems, Inc. Provider Agreement, on May 31, 2007, following the merger of Caremark Rx, Inc. and CVS Corporation, Caremark sent Walgreens via Federal Express a notice of various amendments to the Provider Agreement that would take effect with respect to Walgreens and other retail pharmacies on July 1, 2007.  (Compl. ¶ 23, Exh. 3).  These amendments were set forth in a Provider Manual prepared by Caremark.  (Compl. ¶ 23, Exh. 3).

The Provider Manual states that it "is a part of the Caremark Documents and incorporated into the Provider Agreement with Caremark.  Provider must abide by the provisions and terms set forth in the Provider Agreement.  Nonadherence to any of the provisions and terms of the Provider Agreement (which includes the Provider Manual and all other Caremark Documents) will be a breach of the Provider Agreement with Caremark."  (Compl. ¶ 24, Exh. 3).  Walgreens received the Provider Manual via Federal Express on June 1, 2007.  (Compl. ¶¶ 24-25, Exh. 4).

Page 16 of the Provider Manual, entitled "Termination Without Cause," provides that "Provider may terminate the Provider Agreement without cause upon thirty (30) days' prior written notice to Caremark," unless applicable law, a Caremark network, or a participating plan required a longer notice period.  (Compl. ¶ 26, Exh. 3).  Walgreens did not object to any of the terms of the amendments to the PCS Health Systems, Inc. Provider Agreement set forth in the Provider Manual, including the previously described termination provision.  Accordingly, pursuant to Section 1.3 of the Provider Agreement, these amendments became effective on July 1, 2007.  (Compl. ¶ 27).

**E.    The Health Plans At Issue In This Action**

There are four health plans that will be and have already been affected by Walgreens' imminent termination of service to these plans under the Provider Agreement on less than 30 days' notice.  Walgreens dispenses a significant percentage of the prescriptions for each of these plans, ranging from approximately 23 percent to 60 percent.  (Compl. ¶ 32).  These plans collectively have approximately 380,000 plan participants, approximately 70,000 of which have active prescriptions at Walgreens.  (Compl. ¶ 32).

The Wisconsin Educational Association ("WEA") Trust is a health plan for which Caremark has provided prescription drug benefit services since 2004.  (Compl. ¶ 28).  The WEA

Trust health plan utilizes Caremark's national retail pharmacy network serviced by Walgreens and is a part of a coalition of employer groups. (Compl. ¶ 28).

ArcelorMittal[2] is an employer-sponsored health plan. ArcelorMittal is headquartered in Chicago. ArcelorMittal purchases prescription drugs through a coalition that is a client of Caremark. (Compl. ¶ 29).

Johnson Controls, Inc. and its participating affiliates are an employer-sponsored health plan that has been a client of Caremark since 2004. (Compl. ¶ 30). Johnson Controls, Inc.'s headquarters is in Milwaukee, Wisconsin, with concentrated employee populations in and around Milwaukee as well as eastern Pennsylvania. (Compl. ¶ 30).

Progressive Casualty Insurance Company is an employer-sponsored health plan. This plan purchases pharmacy benefit services through a coalition that is a client of Caremark. (Compl. ¶ 31).

F.    **Walgreens' Notice Of Termination Of The Provider Agreement**

On October 29, 2007, Walgreens faxed Caremark several written notices from its headquarters in Deerfield, Illinois. (Compl. ¶ 33, Exh. 5). Although the notices are dated October 24, 2007, the fax line on each notice indicates that the letter was not faxed until October 29, 2007.[3] (Compl. ¶ 33). The notices stated that Walgreens intended to terminate participation in the following pharmacy benefit plans administered by Caremark: (1) Wisconsin Educational Association Trust plan; (2) the ArcelorMittal plan, (referred to as the Ispat Island plan by Walgreens); (3) the Johnson Controls, Inc. and its participating affiliates plan; and (4) the Progressive Corporation plan. (Compl. ¶ 33, Exh. 5).

---

[2] In Exhibit 5 of the Complaint, Walgreens referred to ArcelorMittal's previous employee-sponsored health plan, Ispat-Inland, when it notified Caremark of its intention to terminate its participation in this plan.
[3] Walgreens initially presented Caremark with written notices of termination on October 24, but these notices were superseded by the notices set forth in Group Exhibit 5.

In violation of the PCS Health Systems, Inc. Provider Agreement, as amended by the 2007 Provider Manual, each notice provided for only a ten-day notice period of termination. Specifically, each notice stated that the termination of Walgreens' participation in each of the above-referenced plans was effective on November 9, 2007 – eleven days after the notices were faxed to Caremark.  (Compl. ¶ 34, Exh. 5).

Unless enjoined, Walgreens will reject insurance coverage for the prescriptions of plan participants who are unaware of this termination and present their prescriptions to Walgreens.  If they are unprepared and unaware, these plan participants will be forced to pay out of their own pockets the "usual and customary" charge to Walgreens – which may not be covered by their health plan – to receive their prescription drugs immediately.  Otherwise, they cannot get their prescriptions filled until a Walgreens' pharmacist has called the pharmacy to which the plan participant wants their prescription transferred.  Because there are approximately 70,000 plan participants who will need to have their prescription records transferred by phone calls from Walgreens' pharmacists to their new pharmacy, this transition will take time.  (Compl. ¶ 32).

## III.    ARGUMENT

### A.    Caremark is Entitled to a Temporary Restraining Order

Caremark is entitled to a temporary restraining order to prevent irreparable harm pending resolution of this litigation.  A plaintiff is entitled to preliminary injunctive relief when it establishes that:  (1) it has a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm absent injunctive relief; (4) the harm to the plaintiff outweighs the harm that the defendant will suffer if the injunction is granted; and (5) the injunction will not harm the public interest.  *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006).  The same analysis applies to the

issuance of a temporary restraining order. *Long v. Bd. of Education*, 167 F. Supp. 2d 988, 990

(N.D. Ill. 2001). The purpose of a temporary restraining order is to maintain the status quo until

a hearing can be held on an application for a preliminary injunction. *See Abbott Labs. v. Sandoz,*

*Inc.*, No. 05 C 5373, 2006 U.S. Dist. LEXIS 90747, at *4 (N.D. Ill. Dec. 15, 2006) ("A TRO is

an emergency remedy issued to maintain the status quo until a hearing can be held on an

application for a preliminary injunction") (citing *Coca-Cola v. Alma-Leo U.S.A., Inc.*, 719 F.

Supp. 725, 726 (N.D. Ill. 1989)). Caremark easily satisfies these standards.

**B.    Caremark Has Legally Protectible Interests**

Caremark has legally protectible interests both in its Provider Agreement and in its

relationships with its health plan clients and their individual plan participants. Caremark entered

into a valid and enforceable Provider Agreement with Walgreens in order to create a network

whereby participants in Caremark's health plan clients could receive their medications.

Caremark also required a 30-day notice of termination requirement to enable it and the

participating health plans sufficient time to prepare for a transition, including notifying plan

participants of the termination, locating new pharmacies, and ensuring that plan participants'

ability to fill their prescriptions are minimally disrupted, should Walgreens decide to terminate it

service of certain plans.

Walgreens' breach of the Provider Agreement interferes with Caremark's protectible

interests. Arizona law, which governs interpretation of the Provider Agreement, recognizes that

a company has a legitimate and protectible interest in safeguarding, *inter alia,* its business

efforts, customer relationships, and goodwill from "intangible injury." *Rent-A-Center, Inc. v.*

*Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (applying

Kansas and Arizona law to affirm district court's grant of a preliminary injunction in order to

protect plaintiff's advertising efforts and goodwill from intangible injury); *Inter-Tel (Delaware), Inc. v. Fulton Comm'ns Tel. Co.,* No. CIV 07-866 PHX RCB, 2007 U.S. Dist. LEXIS 43219, at *21-22 (D. Ariz. June 13, 2007) (recognizing plaintiff's business interests in the Georgia market as a protectible interest and enjoining defendants from causing further damage); *Compass Bank v. Hartley, et al.*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006) (recognizing plaintiff's customer relationships as a protectible interest and enjoining defendants from causing further damage). Moreover, "once a protectible interest is established," as Caremark has established here, "irreparable injury is presumed to follow if the interest is not protected." *Inter-Tel (Delaware), Inc.*, 2007 U.S. Dist. LEXIS 43219, at *21-22 (D. Ariz. June 13, 2007) (quoting *Phoenix Orthopaedic Surgeons, Ltd. v. Peairs*, 164 Ariz. 54, 59 (Ct. App. 1989)); *Compass Bank*, 430 F. Supp. 2d at 983 (same).

### C.   <u>Caremark is Likely to Succeed on the Merits of its Claims</u>

#### 1.   <u>Caremark is Likely to Succeed on its Breach of Contract Claim</u>

Caremark is likely to succeed on the merits of its breach of contract claim because the termination provision contained in the Agreement is enforceable and Walgreens has breached the Agreement by terminating its service of these four Caremark plans without first providing 30 days' prior written notice to Caremark.

Arizona courts recognize and enforce termination provisions requiring prior written notice. *See Southern Arizona School For Boys, Inc. v. Chery, et al.*, 119 Ariz. 277, 279 (Ct. App. 1978) (holding that appellants were entitled to seek special damages arising from a breach of an agreement for failure to provide 30 days prior written notice of termination); *Phelps Dodge Corp. v. Galvez*, 146 Ariz. 69, 71 (Ct. App. 1985) (interpreting an agreement allowing either party to terminate an agreement upon 10 or more days' written notice).  The Agreement is

necessary to protect Caremark's legitimate business interests, and at no point in time did Walgreens either object to the amendment establishing 30 days' written notice prior to termination or notify Caremark pursuant to this termination provision.

a.    Public Interest

Caremark is also likely to succeed on its breach of contract claim because the termination provision in the Agreement is not contrary to the public interest.  In fact, the termination provision is clearly in the public interest, because it enables Caremark to make changes to its retail drug network without substantially disrupting the ability of its plan participants to continue to receive their medications, thereby protecting plan participants from the harm of a sudden disruption in their ability to purchase prescription drugs under their insurance plan.  Furthermore, the Agreement was entered into by two private parties and does not injure the public.  Unless "the acts to be performed would be illegal or violate public policy," Arizona law recognizes the right of parties to enter into private contractual agreements. *White v. Mattox*, 127 Ariz. 181, 184 (1980).  *See also Mason v. State Farm Mut. Auto. Ins. Co.*, 148 Ariz. 271,  274 (Ct. App. 1985) ("Absent an ascertainable contrary public policy, parties should be free to contract as they wish").

Furthermore, at least one court that has considered this issue has determined that it is generally in the public interest to enforce valid contracts, and it is especially in the public's interest to enforce contracts that will result in "individuals obtaining the medicines they need." *NewLife Homecare, Inc. v. Express Scripts, Inc.*, No. 3: 07CV761, 2007 WL 1314861, at *9 (M.D. Pa. May 4, 2007).  In *NewLife*, the plaintiff-pharmacy sought an injunction seeking payment of monies owed by the defendant and enjoining defendant from continuing to withhold these payments.  Plaintiff argued that without these payments, it was in immediate and

irreparable danger of being forced out of business, and that its customers – individuals who filled their prescriptions with plaintiff – would be irreparably harmed, as well, because they would lose access to their medications. *Id.* at *3-4. The court held that a "public interest exists in individuals obtaining the medicines they need," and granted plaintiff injunctive relief. *Id.* at *9. Although for different reasons, Caremark's individual plan participants face a similar situation to the customers in *NewLife* – a disruption in the continuity of their prescription drug service – and as such, the public interest will be served by enforcing the termination provision against Walgreens.

    **D.**    **Caremark And Plan Participants Will Suffer Irreparable Harm and Have No Adequate Remedy**

If Walgreens is permitted to terminate its service of these four plans without first providing 30 days' prior written notice to Caremark, the harm to Caremark and its individual plan participants would be severe and would be impossible to compensate through monetary damages. Walgreens' imminent termination of service to these four plans under the Provider Agreement poses a substantial threat to Caremark's ability to provide an orderly transition process that enables uninterrupted continuity of care. The disruptive effect this would have on Caremark's prescription drug benefits services would be substantial.

Federal courts have granted injunctive relief to protect plaintiffs like Caremark: where a defendant has and will continue to interfere with a plaintiff's "goodwill, competitive position, and continuity of business relationships with its customers," and where such harms are "oftentimes fatal to businesses, and cannot be readily calculated and cured by an award of monetary damages," then injunctive relief is proper. *Diamond Blade Warehouse, Inc,* 420 F. Supp. 2d at 872. Caremark is in precisely this situation. As detailed above, Walgreens' actions have threatened Caremark's ability to provide individual plan participants timely notice of this

change, along with a timely and orderly transition to new network pharmacies. All of these things directly harm Caremark's goodwill, its competitive position as a drug network administrator to its health plan clients, and the continuity of its business relationships with these clients and their individual plan participants. For these reasons, legal remedies alone cannot sufficiently redress the harms that Walgreens will inflict upon Caremark. Caremark is entitled to an injunction to prevent these injuries, because it will suffer irreparable harm to its business relationships that cannot be compensated monetarily. As a result, Caremark has no adequate remedy at law.

Furthermore, Walgreens' actions pose a threat of substantial harm to Caremark's individual plan participants. As previously explained, the 30-day termination period in the Provider Agreement enables Caremark to timely notify its individual plan participants about the change in pharmacy providers, thereby allowing Caremark participants the time to locate new pharmacies and begin the process of transferring their prescriptions to these new pharmacies.

For instance, if Walgreens is not enjoined it will no longer honor prescriptions for these individual plan participants as of November 9, 2007. These participants are then left with a difficult dilemma: they must either wait an undetermined amount of time to fill their prescriptions until they select a new pharmacy and have their prescriptions transferred by Walgreens, or they must pay Walgreens a "usual and customary" rate to continue to have their prescriptions filled. The "usual and customary" rate is the rate charged to cash-paying customers by Walgreens, and it usually considerably higher than the favorable volume rate negotiated by Caremark. Having to pay this "usual and customary" rate will itself present a considerable financial hardship for certain plan participants, and after paying this rate there is no guarantee that these participants will be fully reimbursed by their health plan, because some plans do not

permit reimbursement for prescriptions filled by an out-of-network pharmacy, and other plans reimburse prescriptions filled by an out-of-network pharmacy at lower rates.

However, regardless what these plan participants choose – waiting to fill prescriptions or paying the "usual and customary" fee and risking partial or no reimbursement – the harm to them is immediate and irreparable.  In the case of participants who are seriously ill and without the financial means to pay the "usual and customary" fee, there is a risk of substantial harm to their health.  For those who pay the unfavorable fee, they risk not being reimbursed for their prescriptions.

2.    Hardship to Walgreens

Walgreens will experience little or no hardship if the termination provision amendment to the Provider Agreement is enforced.  The restriction on Walgreens' ability to terminate the Provider Agreement is minimal:  it is only prohibited from terminating service of these four plans without first giving 30 days written notice to Caremark. (Compl. ¶ 26, Exh. 4).  This limited restriction is necessary to prevent providers such as Walgreens from leaving Caremark's individual plan participants in the lurch and forcing them to bear the risk of either waiting an indefinite period to receive their prescriptions or paying a premium to Walgreens to continue to get their prescriptions filled there.  Walgreens' "hardship" of not being able to immediately terminate service of these plans is simply a continuation of the status quo– continued participation in the plans – and cannot and does not outweigh the benefits of enforcement of the Provider Agreement.

Walgreens will continue to be reimbursed for prescriptions filled for Caremark's plan participants during the thirty-day notice period.  If Walgreens were to ultimately prevail in this litigation, its damages would be minimal, if any, and solely monetary in nature.  In short, there is

13

no possible irreparable harm to Walgreens that could result from the grant of the injunctive relief sought by Caremark.

   **E.**    **The Balance of Harms Favors Granting a Temporary Restraining Order**

   As discussed above in sections III(D)(1) and (2), enforcing the Agreement against Walgreens will impose little hardship, if any, on it, but will prevent substantial injury to Caremark's business and its plan participants' health.   Further, as discussed in III(C)(1)(a), it is in the public interest to enforce the contracts made by private entities when such enforcement is not against public policy.   Because of the possibility of substantial harm to Caremark's individual plan participants, especially the possibility of being forced to wait to receive their medications until their prescription records are transferred, in order to maintain the *status quo* Walgreens must be enjoined from terminating it service of the four aforementioned health plans for 30 days, or prior to November 29, 2007.   *See Abbott Labs. v. Sandoz, Inc.*, No. 05 C 5373, 2006 U.S. Dist. LEXIS 90747, at *4 (N.D. Ill. Dec. 15, 2006) ("A TRO is an emergency remedy issued to maintain the status quo until a hearing can be held on an application for a preliminary injunction") (citing *Coca-Cola v. Alma-Leo U.S.A., Inc.*, 719 F. Supp. 725, 726 (N.D. Ill. 1989)). Without such an order, participants in these plans will experience substantial, immediate, and irreparable harm, and this is a risk that far outweighs any harm that results to Walgreens from being forced to continue its participation.   Accordingly, the balance of harms favors granting a temporary restraining order on behalf of Caremark.

   **IV.    CONCLUSION**

   For the foregoing reasons, Caremark respectfully requests that the Court enter the Temporary Restraining Order against Walgreens as stated above and in Caremark's Verified Complaint.

Respectfully submitted,

CAREMARKPCS HEALTH, L.P.


By:   s/ Peter J. Kocoras
            One of Its Attorneys


Howard M. Pearl
Peter J. Kocoras
Courtney M. Oliva
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600 (telephone)
(312-558-5700 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney states that he caused a true and correct copy of the MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER to be filed with the Clerk of the Court, and further caused the same document to be served on counsel for Plaintiff, via hand delivery and facsimile, on this 6th day of November, 2007.

Dana I. Green
Senior Vice President - General Counsel, Corporate Secretary
Walgreen Co.
200 Wilmot Road
Deerfield, Illinois 60015
Fax: (847) 914-3109

By:  __ s/ Peter J. Kocoras
              One of Its Attorneys