**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| CAREMARKPCS HEALTH, L.P., a Delaware Limited Partnership, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 07-C-6272 Honorable Mark Filip |
| WALGREEN CO., an Illinois Corporation | ) ) ) | |
| Defendant. | ) ) ) | |

**WALGREEN CO.'S SUPPLMENTAL MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

Since the filing of Caremark's complaint and Motion for an Emergency TRO, evidence has come to light that demonstrates there is no basis for a TRO here.

- ***First***, despite claiming that Walgreens' decision to terminate its participation in four pharmacy benefit plans will cause "irreparable harm to tens of thousands of plan participants . . . [who will be left] with no choice but to wait for their medication," Caremark and the plans themselves have been issuing public statements that flatly contradict and preclude any such claim. (Pl. Mem. in Supp. of TRO at 1.) For example, the Wisconsin Educational Association Trust ("WEA Trust"), one of the plans at issue in this case, advised its own members that, in the event of Walgreens' termination as of November 13, 2007, members "***can easily have your new pharmacy transfer . . . prescription[s] for you*** . . . ." (*See* Ex. 1, "Frequent questions about Walgreens leaving pharmacy network for WEA Trust," at 1 (emphasis supplied).)[1] WEA likewise assured members who may need a "prescription immediately" that "***you may purchase*** . . . ***prescription drugs from Walgreens and submit the claim to Caremark for reimbursement***" through December 8, 2007. (*Id.* at 2, (emphasis supplied).)

- ***Second***, Caremark itself has publicly contradicted its own claims of purported harm as a result of Walgreens' termination. According to Caremark, it is "***Easy to Switch***" from Walgreens and "new prescriptions may be filled at any participating network pharmacy." (Ex. 2, Caremark Communication to WEA Plan Participants (emphasis added).) Why? Because "[t]he Caremark Retail Network includes 934 Wisconsin

---

[1]    Exhibits 1 and 2 were retrieved from the Wisconsin Educational Association Trust's website.

locations, more than eight out of ten pharmacy locations within the State and ***nearly nine out of ten pharmacies in the nation***.**" (*Id.* (emphasis added).)  Thus, according to Caremark, "new prescriptions may be filled at any participating network pharmacy," of which there are 56,000 in the country.  (*Id.*; Ex. 1, at 2; *see* Ex. 3, Plan Communication ("Caremark has prepared an individualized letter for all [plan] members that 1) will inform them of Walgreens' status, 2) will identify alternative in-network pharmacies near their homes, 3) will tell them how to get their prescriptions transferred . . . .").)

- ***Third,*** Caremark and the plans are correct in saying that plan members can easily switch to a convenient pharmacy in the Caremark network.  Attached as Exhibit 4 is the Declaration of Jillian Beydilly of Walgreens, which sets forth the number and location of alternative pharmacies and their distance from Walgreens pharmacies in the metropolitan areas at issue in this case.  As the evidence shows, there are significantly more non-Walgreens retail pharmacies in these metro areas (including CVS, Osco, Wal-Mart, Target, KMart, Sam's, ShopKo, Dominick's, Pick 'n Save, *etc.*) than Walgreens stores from which plan members can receive their prescriptions.

- ***Finally***, plaintiff's claim—in response to Walgreens' Motion to Dismiss, Or in the Alternative to Stay, Pending Arbitration—that Caremark filed this lawsuit purportedly to vindicate its arbitral rights, is belied by plaintiff's pleadings and conduct.  Caremark's complaint and TRO motion do not say anything about arbitration, but they do confirm that Caremark has known of Walgreens' intent to terminate its participation in the four plans at issue since "October 24"—three weeks ago.  (Cmplt. ¶ 33 n.2 ("Walgreens initially presented Caremark with written notices of termination on October 24 . . . .").)  Despite this, and despite telling this Court that this lawsuit is in aid of arbitration, Caremark has yet to file and serve any arbitration demand and/or seek interim injunctive relief under the American Arbitration Associations Rules.  Caremark has had ample time to initiate arbitration and seek emergency relief in the proper forum under the Provider Agreement; it simply has no intention of doing so, which warrants denial of its "emergency" motion and dismissal of its complaint.

In sum, what Caremark is telling this Court and what Caremark and the plans are saying publicly outside of court are diametrically opposed.  Caremark cannot claim "irreparable harm" in this Court, and yet tell the plans and their members that it is "**Easy to Switch**" from Walgreens to any number of alternative pharmacies—and at no cost whatsoever.  Yet, that is precisely what Caremark has done.  There is no harm, much less irreparable harm, here.  Accordingly, Caremark's motion should be denied.

**ARGUMENT**

## I.    BOTH CAREMARK AND THE PLANS ADMIT THERE IS NO HARM HERE.

As a threshold matter, Caremark cannot rely on purported harm to non-parties as a basis for the entry of a TRO, particularly where Caremark has offered no evidence whatsoever of any such harm.  *See, e.g., MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 357 (7th Cir. 1997) (plaintiff must show that it would suffer irreparable harm).  The Provider Agreement itself makes this point explicit: "***no term or provision . . . is for the benefit of any person who is not a party hereto (including, without limitation, any Eligible Person or Plan Sponsor), and no such party shall have any right or cause of action hereunder.***"  (Cmplt., Ex. 1 (emphasis added).)

Regardless, Caremark and the plans admit that Walgreens' decision to terminate its participation in those plans as of November 13, 2007 will not cause any harm, let alone the type of serious and irreparable harm required for an injunction.  Indeed, the public statements of Caremark and the plans directly contradict plaintiff's allegations in this case.  For example:

| ***Caremark's Allegations in its Complaint*** | **What Caremark and the Plans say Will REALLY Happen To Plan Participants** |
|---|---|
| "Plan participants for whom Walgreens has dispensed prescriptions for years will be unable to have their prescriptions filled by Walgreens and covered by their health plans . . . ."  (Cmplt. ¶ 35.) | As of November 13, "you may purchase your prescription drugs from Walgreens and submit the claim to Caremark for reimbursement . . . the Trust will ensure that you incur no more out-of-pocket cost . . . ." (Ex. 1, at 2.) |
| "Walgreens' sudden termination of service of these plans leaves these participants with no choice but to wait for their medication . . . ." (Pl. Mem. in Supp. of TRO at 1.) | "[Y]ou can ***easily*** have your new pharmacy transfer the prescription for you . . . . If you need to fill your prescription immediately . . . you may purchase your prescription drugs from Walgreens." (*Id.* at 1-2 (emphasis supplied).) |

| | |
|---|---|
| "Walgreens' imminent termination of service . . . poses a substantial threat to Caremark's ability to provide an orderly transition process that enables uninterrupted continuity of care." (*Id.* at 11.) | "You may fill your prescriptions at any of the other 56,000 locations in the pharmacy network . . . ." (*Id.*) <br><br> "Caremark has prepared an individualized letter for all [plan] members that 1) will inform them of Walgreens' status, 2) will identify alternative in-network pharmacies near their homes, 3) will tell them how to get their prescriptions transferred . . . ." (Ex. 3.) |
| Plan participants will be obligated to "pay for the entire cost of the prescription out of their own pockets, at a much higher price . . . ." (*Id.* at 1.) | "Q. **Do I now have to pay more for prescriptions filled at retail pharmacies**? **A:** No. . . . ." (Ex. 1 at 1, (emphasis in original).) |

Further, in its letter to participants in the WEA Trust plan, Caremark identifies three alternative pharmacies close to plan members' homes that participate in Caremark's pharmacy network, taking pains to note that the "Caremark Retail Pharmacy Network includes ***934 Wisconsin locations, more than eight out of ten pharmacy locations within the State and nearly nine out of every ten pharmacies in the nation*** . . . ." (Ex. 2, Caremark Communication to WEA Members (emphasis supplied).) Given this, it is not surprising that Caremark tells plan participants that it is "Easy to Switch" from Walgreens and that, "in most cases you can easily have your new pharmacy transfer . . . prescription[s] for you." (*Id.*) This belies any claim that Walgreens' decision to terminate will "disrupt" participants' lives. (*See* Cmplt. ¶ 35.) Now confirmed by Caremark and the plans in writing, there is no harm at all, much less irreparable harm if Walgreens terminates its participation in these plans effective November 13, 2007.

Finally, and unfortunately, the very third parties about which this Court has expressed its concern have erroneously characterized this litigation in the most intemperate and improper language, perhaps as a tactic to influence the outcome of this case and the ongoing negotiations between Caremark and Walgreens. For example, in an email issued on November 8, 2007 and

posted on its website, the Wisconsin Educational Trust Plan told its plan subscribers that it had "***received word from Caremark*** . . . that Walgreens pharmacies have elected to withdraw from Caremark's retail pharmacy network . . . ." (*See* Ex. 5, 11/8/2007 Email, "Important Information for District WEA Subscribers.")  The communication then claims that "***in order to put pressure on Caremark***, Walgreens has unilaterally, and without provocation, decided that they will no longer serve" the WEA plan members. (*Id.*)  Walgreens' actions are characterized as a "***quest for more profits***," "***reprehensible***," and in "***disregard[]***" of its "***ethical and contractual responsibilities***." (*Id.*)  Invective and intemperate language have no place in a legal dispute or a court of law, and to the extent that this description was suggested, reviewed, or otherwise approved by Caremark, the doctrine of unclean hands is a separate and independent basis for denying its request for injunctive relief.  *Gutierrez v. Gonzales,* 458 F.3d 688, 693 (7th Cir. 2006) ("Equity, after all, includes the venerable doctrine that 'he who comes into equity must come with clean hands.'");  *Polk Bros., Inc. v. Forest City Enterprises, Inc.,* 776 F.2d 185, 193 (7th Cir. 1985) ("If the plaintiff creates or contributes to the situation on which it relies, the court denies equitable relief in order to deter the wrongful conduct.")

## II.    CAREMARK AND THE PLANS ARE CORRECT—WALGREENS' TERMINATION WILL NOT CAUSE IRREPARABLE HARM.

Caremark's claim that it is "easy" for a plan member to transition from Walgreens due to the significant number of Caremark-network pharmacies is true.  For example:

- In the Chicago area (where ArcelorMittal is headquartered), there are 400 Walgreens pharmacies compared to 971 other chain and independent pharmacies—a ratio of 2.43 other pharmacies for each Walgreens pharmacy.  Within a 1.5 mile radius of the 400 Walgreens pharmacies in Chicagoland, there are a total of 884 other pharmacies. (*See* Ex. 4, Decl. of Jillian Beydilli, at Attach. A.)

- In Milwaukee (where Johnson Controls, Inc. is headquartered) there are 80 Walgreens pharmacies compared to 194 other chain and independent pharmacies —a ratio of 2.43 other pharmacies for each Walgreens pharmacy.  Within a 1.5 mile

radius of the 80 Walgreens pharmacies in the Milwaukee area, there are a total of 167 pharmacies. (*Id.,* at Attach. B.)

- In the York/Lancaster, Pennsylvania metro area, where Johnson Controls also has a "concentrated employee population[]" (Cmplt. ¶ 30), there is an even greater disparity. Compared to just 4 Walgreens pharmacies, there are 167 other chain/independent pharmacies—a ratio of 41.75 pharmacies for each Walgreens pharmacy. Within a 1.5 mile radius of the 4 Walgreens pharmacies in the York/Lancaster area, there are 26 other pharmacies. (Ex. 4, at Attach. E.)

- In the Madison, Wisconsin, metropolitan area, where the WEA Trust is headquartered, there are 25 Walgreens pharmacies compared to 58 other pharmacies—a ratio of 2.32 pharmacies for each Walgreens. Within a 1.5 mile radius of the 25 Walgreens pharmacies in the Madison area, there are 58 other pharmacies. (*Id.*, at Attach. C.)

- In the Cleveland, Ohio metropolitan area, where the Progressive Casualty Insurance Company is based, there are just 52 Walgreens pharmacies compared to 347 other pharmacies—a ratio of 6.67 other drugstores for each Walgreens. Within a 1.5 mile radius of the 52 Walgreens pharmacies in the Cleveland area, there are 201 pharmacies. (*Id.* at Attach. D)

In short, as Caremark itself has noted, given the overwhelming presence of other non-Walgreens drugstores, plan members can easily fill prescriptions in the event of a termination by Walgreens, particularly now that the plans have told them how to do so. With "more than 62,000 participating local retail pharmacies" (Cmplt. ¶ 14), Caremark's extensive network precludes any finding of irreparable harm.

## III.   PLAINTIFF'S AFTER-THE-FACT ARBITRATION ARGUMENT FAILS.

After Walgreens moved to dismiss or stay this case pending arbitration, as required by the Provider Agreement, Caremark claimed—for the first time—that it commenced this lawsuit "to protect its contract right to arbitration." (Pl. Mem. In Further Support of Mot. For TRO, at 2.) This argument lacks merit.

*First*, plaintiff's complaint and motion for TRO say no such thing; they do not even mention arbitration. *Second*, by its own admission, Caremark has known of Walgreens' intent to terminate since "October 24," three weeks ago. (Cmplt. ¶ 33 n.2) Despite this, ***Caremark still***

*has not filed any arbitration demand*.  *Third*, Walgreens has never indicated that it would not comply with the arbitration provision in the Provider Agreement.  To the contrary, it was Walgreens that apprised this Court of the arbitration provision and moved the Court to order plaintiff to comply with the Provider Agreement and arbitrate this dispute.

*Finally*, Caremark ignores a simple fact: it could (and, indeed, should) have sought any emergency injunctive relief before the American Arbitration Association, whose Rules govern arbitration of this dispute.   As one court in this district has made clear:

> "An arbitrator, under the AAA rules, may grant injunctive relief.  The AAA Rule 36 of the Commercial Dispute Resolution Procedures provides in relevant part: '(a) The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.' The arbitrator is not bound by legal rules, and may grant any appropriate relief."

*Tenneco Auto. Operating Co. v. Hyrad Corp.,* No. 02 C 0728, 2002 WL 1632499,  at *3  (N.D. Ill.  July 23, 2002).

Plaintiff did not have to file this lawsuit, and it knows it.  Given that it has known of Walgreens' plans for three weeks, Caremark has no excuse for disregarding the Provider Agreement and not filing for arbitration.  Having sat on its hands, acted dilatorily, and chosen to proceed in violation of the contract at issue, plaintiff cannot now seek to invoke the equitable powers of this Court.  *See Hutchinson v. Spanierman*, 190 F.3d 815 (7th Cir. 1999) (one who sleeps on his or her rights loses them);  *Rodriguez v. Airborne Express*, 265 F.3d 890 (9th Cir. 2001) (same).   This Court should enforce the terms of the Provider Agreement and order arbitration of this matter.[2]

## CONCLUSION

---

[2]      Plaintiff's approach, however, may be designed to provide it with two bites at the proverbial apple—*i.e.,* once here, and if it is not successful, then again under the AAA rules.  We do not believe that a Court sitting in equity should permit such tactics.

**For the reasons stated above, Walgreens respectfully requests that this Court enter an order denying plaintiff's motion for a temporary restraining order.**

Respectfully submitted,

/s/ Andrew B. Bloomer, P.C.
Richard C. Godfrey, P.C. (ARDC # 3124358)
Andrew B. Bloomer, P.C. (ARDC # 6209756)
Michael A. Duffy (ARDC # 6272163)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601
Telephone:    (312) 861-2000
Facsimile:    (312) 861-2200

ATTORNEYS FOR DEFENDANT
WALGREEN CO.

**CERTIFICATE OF SERVICE**

The undersigned attorney states that he caused a true and correct copy of the above-described WALGREEN CO.'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER to be served upon the following attorneys of record for plaintiff, via messenger and email, on November 13, 2007, at the following email address:

> Howard M. Pearl (hpearl@winston.com)
> Peter J. Kocoras (pkocoras@winston.com)
> Courtney M. Oliva (coliva@winston.com)
> WINSTON & STRAWN LLP
> 35 West Wacker Drive
> Chicago, Illinois 60601
> (312) 558-5700 (facsimile)

/s/ Andrew Bloomer